IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                                          Criminal No. 18-240

JOHN JAMES HORNEZES

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

AND NOW comes the United States of America, by its attorneys Scott W. Brady, United

States Attorney for the Western District of Pennsylvania, and David Lew, Assistant United States

Attorney for said District, and hereby submits this Response in Opposition to Defendant John

James Hornezes' Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the

"Motion"), Doc. No. 67.

On November 1, 2019, Hornezes was sentenced by this Court to concurrent 72-month

terms of imprisonment for conspiracy to distribute and possess with intent to distribute 500

grams or more of a mixture and substance containing cocaine, possession with intent to distribute

28 grams or more of a mixture and substance containing crack, and possession of a firearm and

ammunition by a convicted felon.   Hornezes had faced a 15-year mandatory minimum sentence

and a Guideline Range, based upon his status as an armed career criminal, of 188–235 months'

imprisonment.   He now seeks a reduction in his sentence under 18 U.S.C. § 3582(c)(1)(A), often

described as the "compassionate release" statute, based on having contracted COVID-19 in June

2020 and the fact that he is housed at FCI-Elkton, where he argues an outbreak of COVID-19 has

occurred.   As discussed below, however, Hornezes does not meet the statute's requirements for

a reduction in sentence, and his Motion should therefore be denied.   Neither a prior COVID-19

infection nor generalized—and in this case unfounded—concerns about the risk of infection at a BOP facility are "extraordinary and compelling reasons" meriting relief.

Moreover, Hornezes was convicted in this Court of committing serious drug and firearms offenses. Before that conviction, he had committed many other serious crimes. Allowing him to avoid serving the substantial remaining portion of his sentence—approximately 4 years— would be contrary to the need under § 3553(a) for his sentence to reflect the nature and circumstances of the offense and his history and characteristics, promote respect for the law and provide just punishment, afford adequate deterrence, and avoid unwarranted sentence disparities. It would also be contrary to the requirement under § 1B1.13 that a defendant demonstrate that he is not a danger to the safety of the community or any other person if released.

## PROCEDURAL HISTORY

On November 30, 2017, Hornezes was charged by a criminal complaint filed in the Western District of Pennsylvania with firearm and drug offenses. Doc. No. 1. On September 17, 2018, a three-count Information was filed against him. Doc. No. 24. He was charged at Count One with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, from in or around September 2016 to on or about November 30, 2017, in violation of 21 U.S.C. § 846. *Id.* He was charged at Count Two with possession with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of crack, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). *Id.* Finally, he was charged at Count Three with possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). *Id.* The violations charged at Counts Two and Three occurred on or about November 30, 2017. *Id.*

On September 17, 2018, the Government filed an Information, pursuant to 21 U.S.C. § 851, stating prior convictions as a basis for increased punishment.   Doc. No. 26.

On December 13, 2018, Hornezes pled guilty to Counts One through Three of the Information.   Doc. No. 39.   In connection with his guilty plea, the Court was informed that an investigation into cocaine trafficking in Allegheny and Westmoreland counties resulted in multiple Title III wiretaps, including the wiretap of a cellular telephone being utilized by Thomas Poole.   Doc. No. 43 ("PSIR") ¶ 10.   Hornezes first came to the attention of investigators after being intercepted over Poole's phone conducting conversations with Poole that were consistent with the purchase and sale of cocaine.   *Id.*   This was further confirmed by investigators when Hornezes was observed by surveillance units meeting with Poole for short periods of time on multiple occasions, including at Poole's drug stash location at 915 Penn Avenue in downtown Pittsburgh.   *Id.*   Based on interceptions over Poole's phone, it was determined that Hornezes was obtaining large amounts of cocaine from Poole.   *Id.*

As a result of this investigation, a federal search warrant was executed at Hornezes' home on November 30, 2017.   *Id.* ¶ 11.   The search yielded the discovery of approximately 200 grams of crack cocaine and a Ruger, Model P89, 9mm caliber pistol, which had been reported stolen.   *Id.*   After the discovery of the contraband, Hornezes told investigators, who were at that time addressing his family members who were present at the search, that "they have nothing to do with this."   *Id.*

On the same date, November 30, 2017, a warrant was executed at Poole's stash house at 915 Penn Avenue.   *Id.* ¶ 12.   That search yielded the recovery of approximately 5 kilograms of cocaine, confirming for investigators Poole's status as a source of supply for various individuals, including Hornezes.   *Id.*   Based on the search results and the multiple drug-related interceptions

over Poole's phone wherein Poole and Hornezes appeared to be setting up the purchase and sale of cocaine, which were confirmed by surveillance operations confirming meetings between the two on multiple occasions, it was foreseeable to Hornezes that the conspiracy was responsible for the sale of over 500 grams of cocaine as charged in the Information. *Id.*

As set forth in the PSIR, and addressed by the Court at sentencing, Hornezes faced the following statutory minimum and Guideline Range sentences of imprisonment:

> **Statutory Provisions:** Counts 1 and 2: The **<u>minimum term</u>** of imprisonment is **<u>10 years</u>** and the maximum term is life at each count. 21 U.S.C. §§841(b)(1)(B)(ii), 841(b)(1)(B)(iii) and 851.
>
> Count 3: The **<u>minimum term</u>** of imprisonment is **<u>15 years</u>** and the maximum term is life. 18 U.S.C. § 924(e).
>
> **Guideline Provisions:** Based upon a total offense level of 31 and a criminal history category of VI, the guideline imprisonment range is **188 months to 235 months**.

*Id*. ¶¶ 82–84 (emphasis added); Doc. No. 52, Gov't Sentencing Memo, p. 5. Notably, Hornezes was facing a 15-year mandatory minimum sentence and a Guideline Range, based upon his status as an armed career criminal, of 188–235 months' imprisonment.

On October 31, 2019, the Court sentenced Hornezes to concurrent 72-month terms of imprisonment—nine years below the mandatory minimum sentence. Doc. No. 55.

Hornezes was subsequently incarcerated at FCI Elkton, and his projected release date is January 21, 2025. *See* https://www.bop.gov/inmateloc/; *see also* Ex. A (noting commitment date of December 17, 2019).

On June 3, 2020, less than a year after he was sentenced, Hornezes filed a motion for compassionate release with the Court (the "First Motion"). Doc. No. 56. In his First Motion, Hornezes conceded that he did not have any COVID-19 risk factors:

> . . . Mr. Hornezes does not does necessarily fall in the category of inmates
> which are placed in the subclass of individuals as being at high risk of
> contracting COVID-19.   Mr. Hornezes is not 65 years old.   Mr. Hornezes
> does not suffer from a pre existing medical condition, including heart,
> lung, kidney, liver condition or diabetes.   Mr. Hornezes does not take nor
> has he ever used medication to strengthen a weak immune system.   And
> Mr. Hornezes is not obese.

*Id* at 2.   Instead, Hornezes asked the Court to grant compassionate release based solely on the

fact that he is a "black man from Pittsburgh."   *Id*.

The United States opposed Hornezes' First Motion because he failed to demonstrate that

he had exhausted his administrative appeals and failed to demonstrate extraordinary and

compelling reasons for a reduction in his sentence, and also because neither the § 3553(a)

sentencing factors nor U.S.S.G. § 1B1.13 warranted a reduction in his sentence.   *See* Doc. No.

59, Response, at 5–25.

On June 25, 2020, the Court entered an Order denying without prejudice Hornezes' First

Motion, finding that he failed to show that he had exhausted his administrative remedies.   Doc.

No. 60.

On December 8, 2020, Hornezes filed a pro se Motion for Release/Reduced Sentence

pursuant to CARES and/or First Step Act.   Doc. No. 61.   The Court subsequently appointed

attorney Robert S. Carey as counsel for Hornezes.   Doc. No. 63.

On January 4, 2021, Hornezes, through counsel, filed an amended Motion to Reduce

Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "Motion").[1]   Doc. No. 67.   In his

Motion, Hornezes contends that he has now demonstrated exhaustion of his administrative

remedies and has further shown extraordinary and compelling reasons due to having contracted

---

[1] Hornezes asks that the Court "enter an Order releasing him to supervised release with a
condition of home confinement."   Motion at 13.   The United States therefore assumes that he is
requesting that his sentence of imprisonment be reduced to time served.

COVID-19 around June 2020 and due to being housed at FCI Elkton. *Id*. at 3–8. Hornezes

also argues that a reduction in his sentence is consistent with the § 3553(a) factors and that he is

not a danger to the community.[2] On January 26, 2021, Hornezes filed a letter with the Court

further arguing for his immediate release. Doc. No. 70.

For the reasons discussed below, Hornezes' Motion should be denied.

## ARGUMENT

### I. Hornezes' Motion Is Ripe for Consideration

18 U.S.C. § 3582(c)(1)(A)—as amended by the First Step Act of 2018—allows a court to

reduce a term of imprisonment based on "extraordinary and compelling" circumstances, but

only:

> upon motion of the Director of the Bureau of Prisons, or upon
> motion of the defendant *after* the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to
> bring a motion on the defendant's behalf or the lapse of 30 days
> from the receipt of such a request by the warden of the defendant's
> facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

Documents filed in connection with Hornezes' current Motion show that he submitted a

request to the BOP on or around April 9, 2020 to be considered for compassionate release based on

the fact that he had been married for 24 years and was not a violent offender. Ex. B. In response,

the BOP asked Hornezes to include the criteria and reason he was applying for compassionate

release and his release plan. *Id*. On or around April 22, 2020, Hornezes responded to the BOP by

asserting the seriousness of the COVID-19 pandemic, that he was not a violent offender, and his

family circumstances. *Id*. The BOP reviewed Hornezes' request and informed him in a response

---

[2] Hornezes no longer asserts that he is entitled to a reduction in his sentence because he is a
"black man from Pittsburgh." *Cf*. First Motion at 2.

dated May 1, 2020 that based on a review of his medical records, he did not meet the criteria for compassionate release/reduction in sentence at the time.   *See* Ex. C (noting the BOP is taking extraordinary measures to contain the spread COVID-19 and treat any affected inmates).   His request was therefore denied.

Because Hornezes has waited "30 days from the receipt of such a request by the warden" to file his Motion, his current Motion is ripe and this Court may consider it.   18 U.S.C. § 3582(c)(1)(A).

## II.     Hornezes Has Not Shown "Extraordinary and Compelling Reasons" for Release as Required by 18 U.S.C. § 3582(c)(1)(A)

Hornezes contends that he has demonstrated extraordinary and compelling reasons for release, as required under 18 U.S.C. § 3582(c)(1)(A), because he contracted COVID in June 2020 and because he is housed at FCI Elkton.   He is wrong.   18 U.S.C. § 3582(c), created by the Sentencing Reform Act of 1984, provides that "[t]he court may not modify a term of imprisonment that has become final except" in limited circumstances.   If the BOP or the defendant files a timely motion under § 3582(c)(1)(A) with the district court, the court

> may reduce the term of imprisonment . . . ***after considering the factors set forth in section 3553(a)*** to the extent that they are applicable, ***if it finds that***–
>> (i) ***extraordinary and compelling reasons warrant such a reduction***…
>
> ***and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission***….

18 U.S.C. § 3582(c)(1)(A) (emphasis added).   Section 603 of the First Step Act of 2018 amended § 3582(c)(1)(A) to allow the court to act "upon motion of the defendant" in addition to "upon motion of the Bureau of Prisons," assuming timeliness and the other conditions are met. Pub. L. 115-391, § 603(b)(1), 132 Stat. 5194, 5239.   However, the First Step Act did not change the substantive definition of "extraordinary and compelling reasons."

The Sentencing Reform Act of 1984 authorized the Sentencing Commission to define "extraordinary and compelling reasons." *See* Pub. L. 98-473, § 217(a), 98 Stat. 1837, 2019 (enacting 28 U.S.C. § 994). The Commission has fulfilled these tasks through its policy statement at U.S.S.G. § 1B1.13 and its application notes. The policy statement echoes § 3582(c)(1)(A)'s requirement that the court determine that "extraordinary and compelling reasons warrant the reduction." U.S.S.G. § 1B1.13(1)(A). The court must also find that "the defendant is not a danger to the safety of any other person or to the community" under 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).[3]

Application Note 1 to U.S.S.G. § 1B1.13 sets forth the "extraordinary and compelling reasons" that may justify release under § 3582(c)(1)(A). "[E]xtraordinary and compelling reasons" include "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1. A defendant must have a *current* illness, such as a "serious physical or medical condition," to meet these criteria. The risk of contracting a disease *in the future* does not, on its own, satisfy subdivision 1(A).

Neither defendants nor this Court may create additional reasons for release under § 3582(c)(1)(A), beyond those determined by Congress, the Sentencing Commission, and the BOP. "Congress patently did not" expand the definition of "extraordinary and compelling reasons" in the First Step Act, and courts therefore must follow the policy statement in § 1B1.13

---

[3] Although the body of the Guideline states that a court may act "[u]pon motion of the Director of the Bureau of Prisons," § 1B1.13, and therefore does not yet include the procedural change made by the First Step Act, that discrepancy is separate from the Application Note's definition of "extraordinary and compelling circumstances." Thus, the Court should continue to rely upon the Application Note's guidance in evaluating "extraordinary and compelling circumstances."

"as it stands." *United States v. Lynn*, Crim. No. 89-72-WS, 2019 WL 3805349, at *2–4 (S.D. Ala. Aug. 13, 2019); *see also, e.g.*, *United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020).

Decisions from some district courts, including some from this Court, have concluded that § 1B1.13 is no longer an "applicable" policy statement that binds the courts because it has not yet been "updated . . . to account for the First Step Act," *United States v. Somerville*, Crim. No. 12-225, 2020 WL 2781585, at *6 (W.D. Pa. May 29, 2020) (Ranjan, J.). *See also United States v. Jones*, Crim. No. 18-43, Doc. No. 71 at 4–5 (Bissoon, J.) (finding the same); *United States v. Smith,* Crim. No. 15-44, Doc. No. 125 at 4 (Ambrose, J.) (finding the same in dicta). The United States' position, however, is that whether or not the Sentencing Commission has recently amended § 1B1.13, the First Step Act did not change the detailed substantive standard for "extraordinary and compelling reasons" or silently repeal the Commission's sole authority to define that term. *Cf. United States v Burrows*, No. 17-224, 2020 WL 6546134, at *2 (W.D. Pa. Nov. 6, 2020) (Schwab, J.) ("Although the relevant portions of the Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they provide some benchmarks for this Court's consideration.").

By statute, the Sentencing Commission's definition of "extraordinary and compelling reasons" is binding when courts consider a request for compassionate release. Section 3582's delegation of that power to the Commission is entirely appropriate: it furthers the goal of having a single nationwide standard for compassionate release (given the general principle of finality in criminal sentences), and respects the expertise of the Commission and the BOP in determining that standard. Deference is especially important because the BOP may release a prisoner to home confinement in appropriate circumstances as an alternative to compassionate release.

The Commission's limited definition of "extraordinary and compelling reasons" is especially important during the ongoing pandemic. The Third Circuit has noted that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering the BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Courts that set their own standards may cause inconsistent definitions of "extraordinary and compelling reasons," disparities between inmates, and the unnecessary release of dangerous defendants—particularly because nearly every federal prisoner could claim that continued imprisonment increases his or her risk of contracting COVID-19. *See United States v. Roeder*, No. 20-1682, 2020 WL 1545872, at *3 n.16 (3d Cir. Apr. 1, 2020) (per curiam) (unpublished) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). And by granting widespread compassionate release on a case-by-case basis, courts could increase, not decrease, the risk of COVID-19 transmission. BOP will be forced to divert personnel and resources from its existing anti-virus efforts to process released inmates, screen them for COVID-19, and provide transportation for them—all of which will involve physical interactions that may spread the virus further.

Hornezes argues that he has demonstrated extraordinary and compelling reasons for release because he tested positive for COVID-19 on June 26, 2020 and because he is housed at FCI Elkton, which experienced a prior COVID-19 outbreak. He is wrong. Under the definitions set forth by the Sentencing Commission and the BOP, a prior COVID-19 infection does not qualify as an "extraordinary and compelling reason" for release. If an inmate has a

chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19[4], that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I).

Here, Hornezes states that he tested positive for COVID-19 on June 26, 2020. Motion at 7–8. Hornezes' BOP medical records, attached as Exhibit D[5], indicate the following COVID-19 test results, listed by date reported:

    <u>May 31, 2020</u>: Inconclusive (Ex. D at US_0100)

    <u>June 9, 2020</u>: Not Detected (*Id*. at US_0096)

    <u>June 26, 2020</u>: Detected (*Id*. at US_0093)

    <u>July 10, 2020</u>: Not Detected (*Id* at US_0089)

    <u>July 17, 2020</u>: Not Detected (*Id*. at US_0085)

    <u>November 16, 2020</u>: Not Detected (*Id*. at US_0083)

    <u>December 5, 2020</u>: Not Detected (*Id*. at US_0080)

Thus, Hornezes had one positive COVID-19 test on June 26, 2020, then tested negative on his next test, reported on July 10, 2020, and on future tests.

---

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/index.html.
[5] The records are updated as of January 14, 2021. For ease of reference, bates labels were applied.

A prior COVID-19 infection is not identified by the CDC as a risk factor for either future infection or severe complications. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed January 30, 2021). Thus, a prior infection does not "substantially diminish" a defendant's ability "to provide self-care within the environment of a correctional facility," and for that reason, Hornezes does not satisfy subdivision 1(A) of the Sentencing Commission's definition of "extraordinary and compelling reasons" for release. U.S.S.G. § 1B1.13 app. note 1; *see also United States v. Evans*, Cr. No. 13-173, 2020 WL 6144006, at *9 (W.D. Pa. Oct. 20, 2020) (Colville, J.) ("Evans does not fall within the Medical Condition prong because, although he contracted COVID-19 and is slightly obese, there is no evidence that his ability to provide self-care within FCI-Elkton is substantially diminished."); *United States v. Gibson*, Cr. No. 15-256, 2020 WL 4003661, at *1 (W.D. Pa. July 15, 2020) (Bissoon, J.) ("Simply, Defendant has not shown any extraordinary or compelling reason for any reduction in his sentence. While Defendant has contracted the virus, he has no pre-existing conditions and his symptoms are not severe."); *United States v. Hilts*, No. 2:11-cr-133, 2020 WL 4450373, at *2 (W.D. Pa. Aug. 3, 2020) (Ambrose, J.) ("There is no indication that he suffered from complications of any kind [from COVID-19]. Consequently, any risk to the Defendant that COVID-19 poses is, therefore, minimized."); *cf. United States v. Patton*, No. 2:19-cr-8, Doc. No. 2293, Memorandum Order, at 2 (W.D. Pa. Aug. 21, 2020) (Ranjan, J.) (denying temporary release and finding it "entirely speculative to presume that [defendant's] prior COVID-19 diagnosis would place him at a higher risk of contracting the virus again.").

While Hornezes asserts that "[h]ealth authorities speculate that the virus will have life long consequences for those who have been exposed" (Motion at 8), as this Court has recognized, "[s]peculation concerning possible future conditions . . . does not constitute a

'compelling reason' for release." *Evans*, 2020 WL 6144006, at *9. Moreover, although Hornezes claims that he has been short of breath and winded since being exposed to COVID-19 (Motion at 8), he cites to no medical records documenting these symptoms. To the contrary, his subsequent medical records state that he did not report chest pain or shortness of breath (US_0007), wheezing (US_0012), or other COVID-related symptoms. *See also* US_0057 (listing no breathing issues under current health problems). And even if Hornezes had demonstrated that he was experiencing these symptoms, they would fall short of establishing "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See Evans*, 2020 WL 6144006, at *7 ("The court notes that Evans is not symptom-free, because he has a persistent cough. That symptom, by itself, does not appear to pose serious health risks or prevent [the defendant] from engaging in self-care. On this record, the fact that Evans contracted and mostly recovered from COVID-19 does not justify compassionate release."). Hornezes does not allege, must less demonstrate, that he received inadequate treatment for his condition. *Cf.* Ex. D at US_0048–49 (noting Hornezes was a "No Show" on numerous dates).

Hornezes further suggests that a COVID-19 outbreak at FCI-Elkton is an extraordinary and compelling reason for release. Motion at 6–8. He provides no evidence, however, that his current risk of infection is higher at FCI Elkton than at any other institution. Indeed, recent decisions, including by this Court, have recognized that while the facility was initially impacted significantly by COVID-19, "Elkton has 'shown signs that BOP measures designed to protect inmates such as visitation restrictions, mass testing, and modifications to facility operations are helping to curtail the spread of the virus.'" *United States v Burrows*, No. 17-224, 2020 WL 6546134, at *3 (W.D. Pa. Nov. 6, 2020) (Schwab, J.); *Id.* ("[A]lthough nine inmates have died of

Covid-19 while incarcerated at FCI Elkton, all of those deaths occurred prior to early May."); *United States v. Williams*, Cr. No. 18-335, 2020 WL 4934659, at *5 (W.D. Pa. Aug. 24, 2020) (Fischer, J.) (noting the same); *United States v. Grasha*, No. 18-325, 2020 WL 5747829, at *3–4, *7 (W.D. Pa. Sept. 24, 2020) (Conti, J.) ("[Defendant's] current arguments for release, especially considering the greatly improved conditions at FCI-Elkton, do not outweigh the factors considered by the court in imposing his original sentence."); *United States v. Young*, Cr. No. 18-196(2), 2020 WL 5350295, at *4 (D. Minn. Sept. 4, 2020) ("[B]ased on the significant decrease of positive COVID-19 cases and the large number of those who have recovered from the virus at FCI Elkton, the Court finds that the facility's mitigation efforts have been effective and that there is no indication it will be unable to properly care for [defendant] in the unfortunate event that he becomes ill."). As of January 30, 2021, the BOP lists 5 inmates positive and 30 staff positive at FCI Elkton. *See* https://www.bop.gov/coronavirus/.

Moreover, Hornezes' request for a reduction in sentence ignores the significant efforts the BOP has already taken to protect inmates from the disease—including its expanded use of home confinement under 18 U.S.C. § 3624(c)(2). As discussed above, the BOP has transferred thousands of inmates to home confinement since March 26, 2020. Following Congress's passage of the CARES Act on March 27, the Attorney General has now "expand[ed] the cohort of inmates who can be considered for home release" and directed the BOP to give priority "to the most vulnerable inmates at the most affected facilities." Memorandum from Attorney General to Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," Apr. 3, 2020, *available at* https://www.justice.gov/file/1266661/ download. Protecting high-risk inmates through home confinement, rather than compassionate release, has several advantages. An inmate remains under BOP authority during home

confinement and is subject to discipline for a violation of the confinement conditions—or even indictment for escape, should the defendant abscond. *See* 18 U.S.C. § 751(a); *United States v. Robinson*, 639 F. App'x 157, 157 (3d Cir. 2016) (unpublished). The BOP may also seek to place a prisoner in temporary home confinement, or on furlough for medical or other reasons under 18 U.S.C. § 3622. Finally, the BOP can apply a single standard for granting home confinement that is consistent across all facilities and that takes into account BOP's other efforts to combat the virus. The BOP's increased use of home confinement will result in many inmates' requests for compassionate release being "speedily dispatched" to their satisfaction. *Raia*, 954 F.3d at 597.

More recently, the BOP continues to receive, distribute, and administer the COVID-19 vaccine under guidance from the Centers for Disease Control and Prevention and Operation Warp Speed (OWS), a public-private partnership established by the federal government. *See* https://www.bop.gov/resources/news/pdfs/20210115_press_release_vaccination.pdf. As of January 15, 2021, the vaccine had been delivered to staff and inmates at approximately 68 of the BOP's correctional facilities across the country. *Id*. Based on weekly allocations determined by the CDC and OWS, all BOP facilities are expected to receive their first dose by mid-February. *Id*. The vaccine is offered broadly to staff, roughly half of whom have opted to vaccinate at recipient locations. *Id*. A plan was also developed to offer the vaccine to the inmate population as additional doses become available and based on priority of need in accordance with CDC guidelines and as determined by OWS. *Id*. As of January 15, 2021, the BOP administered 17,189 doses of the vaccine. *Id*. One dose has been administered to 7,576 staff and 5,457 inmates. *Id*. A completed series of two doses have been administered to 1,027 staff and 1,051 inmates. *Id*.; *see also* Federal Bureau of Prisons Clinical Guidance, COVID-19

Vaccine Guidance, January 4, 2021, available at https://www.bop.gov/resources/pdfs/

2021_covid19_vaccine.pdf.

**III.    Even If Hornezes has Shown "Extraordinary and Compelling Reasons," Compassionate Release Is Not Appropriate Under the § 3553(a) Factors and § 1B1.13.**

Even if Hornezes had demonstrated extraordinary and compelling reasons under

§ 3582(c)(1)(A)—which he has not—the Court should not reduce his term of imprisonment

because he fails to show that he merits release under the § 3553(a) factors and that he is not a

danger to the safety of the community under § 1B1.13.   Section 3582(c)(1)(A) requires that this

Court must "consider[] the factors set forth in section 3553(a) to the extent that they are

applicable" before it reduces a defendant's prison term.   Here, neither 1B1.13 nor the § 3553(a)

factors warrant a reduction in the sentence this Court originally imposed.

The factors to be considered include: (1) "the nature and circumstances of the offense and

the history and characteristics of the defendant;" (2) "the need for the sentence imposed -- (A) to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect

the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most

effective manner;" (3) "the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct;" (4) the sentencing

guidelines; and (5) "the need to provide restitution to any victims of the offense."   18 U.S.C.

§ 3553(a).

Hornezes was sentenced by this Court to three concurrent 72-month terms of

imprisonment.   He was committed on December 17, 2019 (Ex. A), and if released now, he

would avoid serving the vast majority of his sentence, of which approximately four years are remaining.   *See* https://www.bop.gov/inmateloc/ (noting projected release date of January 21, 2025).

Hornezes' sentence was appropriate in light of his serious criminal conduct and lengthy criminal history, and remains so.   As detailed above, Hornezes pled guilty to trafficking in significant quantities of cocaine and crack and unlawfully possessing a firearm and ammunition after having been convicted of numerous prohibiting offenses.   As noted, the Government conducted a Title III wiretap investigation, which included a wiretap of a cellular telephone being utilized by cocaine trafficker Thomas Poole.   Hornezes was heard in conversations with Poole discussing the purchase and sale of cocaine.   Hornezes was further observed meeting with Poole on multiple occasions, including at Poole's drug stash location.   Investigators ultimately determined that Hornezes was obtaining large amounts of cocaine from Poole.   In November 2017, a federal search warrant was executed at Hornezes' home, resulting in the discovery of approximately 200 grams of crack cocaine and a Ruger pistol, reported stolen, and $8,887 in currency.

Beyond the circumstances of his offense, Hornezes also had a lengthy criminal history. He was an armed career criminal, and as detailed in his PSIR, has engaged in criminal conduct throughout his adult life:

- At age 18, Hornezes was first arrested by law enforcement and convicted of criminal mischief.   PSIR ¶ 34.

- At age 20, Hornezes was arrested on four separate occasions.   First, for disorderly conduct, second, for two counts of possessing with intent to distribute a controlled substance and one count of driving an unregistered vehicle, third, for possession of a controlled substance and resisting arrest, and, fourth, for

possession of a controlled substance. Hornezes pled guilty to each of these counts. *Id.* ¶¶ 36–38.

- At age 21, Hornezes was charged with and pled guilty to driving while license suspended. *Id.* at ¶ 39.

- At ages 22 and 23, Hornezes was charged with and pled guilty to disorderly conduct. *Id.* at ¶¶ 40–41.

- At age 23, Hornezes was charged with and pled guilty to delivery of a controlled substance, two counts of possession of a controlled substance, and one count of criminal conspiracy. During this offense, on October 14, 1997, an officer with the Pittsburgh City Police Department observed the defendant possessing five green balloons containing heroin in his mouth. The defendant also was observed selling five green balloons of heroin to an undercover detective for $50. *Id.* at ¶ 42.

- At age 23, Hornezes pled guilty to receiving stolen property. *Id.* at ¶ 44.

- At age 24, Hornezes was charged with and pled guilty to delivery of a controlled substance for selling three balloons of heroin to an undercover officer. *Id.* at ¶ 45.

- At age 24, Hornezes pled guilty to harassment. *Id.* at ¶ 46.

- At age 32, Hornezes was charged with and pled guilty to possession with intent to deliver a controlled substance, possession of a controlled substance, fleeing or attempting to elude officer, and driving with a suspended or revoked license. According to the affidavit of probable cause, on April 19, 2006, officers with the Pittsburgh City Police Department conducted an undercover purchase of crack cocaine from the defendant for $50. The defendant fled in his vehicle and had to be pulled from the car when caught. *Id.* at ¶ 47.

- At age 36, Hornezes was charged with and pled guilty to fleeing or attempting to elude officers, tampering with or fabricating physical evidence, possession of a controlled substance, and driving while operating privilege is suspended or revoked. According to the criminal complaint, on November 4, 2010, detectives with the Pittsburgh City Police Department attempted to conduct a traffic stop for a burnt-out taillight. The vehicle failed to stop and continued down numerous residential streets. After the pursuit ended, the defendant threw a baggie corner of crack cocaine out of the vehicle. *Id.* at ¶ 48.

- At age 36, Hornezes was charged with and pled guilty to two counts of possession of a controlled substance, possession of drug paraphernalia, and driving while license suspended or revoked. According to the criminal complaint, on November 15, 2010, detectives with the Pittsburgh City Police Department conducted a traffic stop on a vehicle being driven by the defendant. The

detectives observed a plastic baggie missing a corner and a white codeine pill. The detectives further searched the vehicle and the defendant and found loose crack cocaine in his jacket and $649 in his pants. *Id.* at ¶ 49.

- At age 39, Hornezes was charged with and pled guilty to DUI and driving while license suspended or revoked. *Id.* at ¶ 50.

- At age 42, Hornezes was charged with and pled guilty to disorderly conduct. *Id.* at ¶ 51.

Hornezes' extensive criminal history and repeated violations of the law weigh strongly against reducing his sentence, and undermine his claim that serving the remaining portion of his sentence is not needed to protect the public from further crimes (Motion at 10).

Despite Hornezes' contention that his past offenses are non-violent (Motion at 12), drug trafficking continues to present a substantial risk of danger to the community. "The statutory language, as well as the legislative history [of the Bail Reform Act], unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985); *see also United States v. Atkins*, No. 15-87, 2015 WL 4920831, at *7 (W.D. Pa. Aug. 18, 2015) (Fischer, J.) (explaining, in addressing a bond motion, that "[d]rug trafficking certainly poses a substantial risk of harm to the community"); *United States v. Oliver*, No. 16-40, 2016 WL 1746853, at *8 (W.D. Pa. May 3, 2016) (Fischer, J.) ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs like heroin and cocaine.") (citations omitted).

Additionally, many federal drug trafficking defendants present a substantial risk of recidivism if released on bond because many are not first-time offenders. "It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and, thus, because of the nature of the criminal

activity with which they are charged, they pose a significant risk of pretrial recidivism." *United States v. Strong*, 775 F.2d 504, 507 (3d Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 20).

In light of the serious criminal conduct underlying Hornezes' conviction and his extensive criminal history, the Court's original sentence remains appropriate. Reducing Hornezes' sentence to time served would undermine the need for his sentence to reflect the nature and circumstances of the offense and his history and characteristics, promote respect for the law and provide just punishment, and afford adequate deterrence under § 3553(a). For the same reasons, Hornezes fails to show under U.S.S.G. § 1B1.13 that he is not a danger to the safety of any other person or the community. Furthermore, Hornezes proposes to be released to the same address where he committed the serious crimes leading to his conviction in this case. *See* Motion at 11–13.

Finally, § 3553(a) requires the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Here, Hornezes was facing a 15-year mandatory minimum sentence and a Guideline Range, based upon his status as an armed career criminal, of 188–235 months' imprisonment. PSIR ¶ 82. He was actually sentenced to concurrent terms of imprisonment of 72 months (6 years), which was 9 years below the mandatory minimum sentence in this case. While the United States does not oppose that sentence, granting a further reduction in Hornezes' sentence would create an unwarranted sentence disparity.

**IV.   If the Court Orders Compassionate Release, It Should Allow the BOP a Reasonable Period of Time for Quarantine and to Process and Screen the Defendant Before Release.**

Finally, if the Court orders Hornezes' compassionate release under § 3582(c)(1)(A)—which, for all the reasons stated above, it should not—it should allow BOP to place Hornezes in

a 14-day quarantine period and conduct medical clearance before release, in order to minimize the possibility of any spread of COVID-19 from the inmate to the public. Such a period will also allow the BOP a reasonable time to allow the BOP to fulfill its obligations under certain federal statutes. *See, e.g.*, 18 U.S.C. § 3771 (notification of victims and witnesses of inmate's release); 18 U.S.C. §§ 4042(b), (c) (notification of law enforcement officials of inmate's release); 42 U.S.C. § 14135a (collection of DNA samples). The U.S. Attorney's Office as well must notify crime victims of any release of a defendant. 18 U.S.C. § 3771(a)(2).

An orderly release process is particularly important during the COVID-19 pandemic, so that BOP can screen the inmate for the virus and arrange for transportation while minimizing the personal interactions required. For comparison, the Attorney General has directed that inmates released to home detention be placed in a 14-day quarantine, either at a BOP facility or at their post-release residence. Similar precautions are appropriate for individuals granted compassionate release, for the protection of those inmates, BOP personnel, and others at their release locations.

A brief delay in the Hornezes' release will also allow the BOP to make the necessary logistical arrangements for processing his release, including any transportation within the BOP that may be necessary.

However, the need for a delay in release underscores why release under § 3582(c)(1)(A) is not appropriate in this case. The BOP has taken extensive action to mitigate the spread of COVID-19, such as transferring a significant number of high-risk prisoners to home confinement under § 3624(c)(2), and more recently administering the COVID-19 vaccine to staff and inmates. Hornezes instead asks this Court to order compassionate release under § 3582(c)(1)(A), but he does not meet that statute's standards. Neither a past COVID-19 infection nor being housed at

FCI Elkton are an "extraordinary and compelling reason" for release, and the § 3553(a) factors and U.S.S.G. § 1B1.13 do not support a reduction in Hornezes' sentence. This Court should therefore not grant the extraordinary remedy of compassionate release in this case.

**CONCLUSION**

For the above reasons, the United States respectfully requests Hornezes' Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) be denied.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

*/s/ David Lew*
DAVID LEW
Assistant U.S. Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
412-894-7482 (tel)
412-644-2644 (fax)
david.lew@usdoj.gov
PA ID No. 320338